IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION
CASE NO.:

LINDA REPLOGLE,

  Plaintiff,

vs.

DEPUY ORTHOPAEDICS, INC.; DEPUY
SYNTHES, INC.; DEPUY SYNTHES
PRODUCTS, INC.; DEPUY SYNTHES SALES
INC. d/b/a DEPUY SYNTHES JOINT
RECONSTRUCTION; DEPUY INTERNATIONAL,
LTD.; and JOHNSON & JOHNSON,

  Defendants,

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Linda Replogle (hereinafter referred to as "Plaintiff"), by and through undersigned counsel, files this Complaint and Demand for Jury Trial against DEPUY ORTHOPAEDICS, INC.; DEPUY SYNTHES, INC.; DEPUY SYNTHES PRODUCTS, INC.; DEPUY SYNTHES SALES INC. d/b/a DEPUY SYNTHES JOINT RECONSTRUCTION; DEPUY INTERNATIONAL, LTD.; and JOHNSON & JOHNSON and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Linda Replogle is a citizen and resident of the State of Florida and resides in Lake County, Florida.

2. Defendant DePuy Orthopaedics, Inc. ("DePuy") is and, at all times relevant, was a corporation organized and existing under the laws of the State of Indiana, with its headquarters and principal place of business located at 700 Orthopaedic Drive, Warsaw, Indiana 46582. DePuy is a wholly-owned subsidiary of Johnson & Johnson, a publicly traded company.

3.     Defendant DePuy Synthes, Inc. is and, at all times relevant, was a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 700 Orthopaedic Drive, Warsaw, Indiana 46581.

4.     Defendant DePuy Synthes Products, Inc. is and, at all times relevant, was a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 325 Paramount Drive, Raynham, Massachusetts 02767.

5.     Defendant DePuy Synthes Sales, Inc. d/b/a/ DePuy Synthes Joint Reconstruction ("DSS") is and, at all times relevant, was a corporation organized and existing under the laws of the State of Massachusetts, with its principal place of business located at 325 Paramount Drive, Raynham, Massachusetts 02767.

6.     Defendant DePuy International, Ltd. is a public entity or corporation organized and existing under the laws of the United Kingdom, with its principal place of business at St. Anthony's Road, Beeston, Leeds, West Yorkshire, LS11 8DT, United Kingdom.

7.     Defendant Johnson & Johnson is and was a public entity or corporation organized and existing under the laws of the State of New Jersey, with a principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

8.     At all relevant times, each Defendant was the representative, agent, employee or alter ego of the other Defendant, and in doing the things alleged herein was acting within the scope of its authority as such.

9.     Jurisdiction is based upon diversity of citizenship and jurisdictional amount pursuant to 28 U.S.C. §§ 1332.

10.     This Court has personal jurisdiction over all of the Defendants (hereinafter collectively referred to as "Defendants") pursuant to § 48.193, Florida Statutes and other authority

because Defendants have, at all times material, through their agents, officers, distributors, and/or representatives:

> Operated, conducted, engaged in, and/or carried on a business venture in Florida and has an office in Florida;
>
> Committed a tortious act within this State;
>
> Owned, used, possessed or held a mortgage or other lien on real property within this State; and/or
>
> Engaged in substantial and not isolated activities within Florida by, among other things maintaining stores, manufacturing or other facilities, offices, employees, distributors, and/or registered agents in Florida, selling products in Florida, advertising products in Florida, or entering into contracts in Florida.

Further, at all times material, Defendants transacted, conducted and have actively done business in the State of Florida and throughout the United States, and specifically targeted the State of Florida with their conduct, including manufacturing, design, and sales activities in this State. As a result, Defendants expected or should have expected its acts to have consequences through the United States and the State of Florida, and they derived substantial revenue from interstate commerce including in and through the State of Florida.

11.    A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in the Middle District of Florida.

12.    Pursuant to 28 U.S.C. § 1391, venue is proper in the United States District Court for the Middle District of Florida.  What's more, each of the Defendants is subject to personal jurisdiction in this district and their contacts in Florida are sufficient to subject them to personal jurisdiction here.

## BACKGROUND

13.     The knee is the largest joint in the human body, consisting of three individual bones: the shin bone (tibia), the thigh bone (femur), and the knee-cap (patella).  The knee joint is lined with cartilage to protect the bones from rubbing against each other.  This ensures that the joint surfaces can glide easily over one another.  The human knee is a complicated joint which supports the entire body weight on four small surfaces through a variety of motions essential to everyday life.  It is also the joint most susceptible to arthritis.

14.     With the increases in lifespan, people have begun to suffer pain and disability from knee joint arthritis at significant rates.  Knee replacement technology can provide a solution to the pain and restore basic function to those implanted.  The knee replacement implants designed and approved in the 1990s met the goals of reducing pain and restoring function with low failure rates.

15.     Total knee arthroplasty ("TKA"), also called total knee replacement ("TKR"), is a commonly performed orthopedic procedure.  The surgery is designed to help relieve pain, to improve joint function, and to replace bones, cartilage and/or tissue that have been severely injured and/or worn down generally in people with severe knee degeneration due to arthritis, other disease or trauma.  A TKA is ordinarily a successful orthopedic procedure with excellent clinical outcomes and survivorship.

16.     In a total knee replacement surgery, sometimes referred to as "arthroplasty," physicians replace the joint surfaces and damaged bone and cartilage with artificial materials.  The replacement redistributes weight and removes the tissue and/or bone causing inflammation, and thus reduces pain while improving the joint's function.  Replacement requires a mechanical connection between the bones and the implant components.

17.     Bone cement, or epoxy, is used to attach components of the new artificial knee joint to the femur (thigh bone) and tibia (shin bone).  Bone Cement includes a powder and a liquid that

must be combined.  The powder component consists mainly of polymer poly (methyl methacrylate) ("PMMA") and includes a radiopacifier to make the cement visible on x-rays.  The liquid component is a methyl methacrylate ("MMA") monomer which is added to the powder to create a heat-generating (exothermic) reaction.

18.     Cement "viscosity" determines the handling and working properties of the cement.  Bone cement may be divided into three kinds: low, medium, and high viscosity ("HV").

19.     SmartSet HV Bone Cement ("SmartSet HV"), the product at issue, is a high viscosity cement.

20.     According to Defendants, "SmartSet HV Bone Cement was first launched in 2003 together with a variant of the cement containing the active substance Gentamicin."

21.     In February 2003, Defendants received FDA clearance of the SmartSet HV Bone Cement under the "510k" notification process.  The basis for FDA clearance of SmartSet HV Bone Cement was substantial equivalency to prior bone cements, including, but not limited to, DePuy 1 Bone Cement - P960001/Supplement 3 and Palacos R40 Bone Cement - P8 10020/Supplement 3.

22.     According to the 510(k) Summary of SmartSet HV Bone Cement, under the Section titled "Substantial Equivalence," it states that "SmartSet HV Bone Cement has similar indications for use as other bone cements currently marketed in the United States.  These predicate devices include: 1) DePuy I Bone Cement 2) Palacos R40 Bone Cement.  All three bone cements are intended to be used for the fixation of artificial joints and prosthesis to host bone.  Based on similarities of design, materials, intended use, and testing performed, DePuy believes that the subject SmartSet HV Bone Cement is substantially equivalent to the above described FDA cleared devices currently on the market."

23.    However, SmartSet HV Bone Cement was and is less effective, and more prone to failure, than the previously approved bone cements.  Defendants received FDA 510(k) approval of the SmartSet HV Bone Cement in February 2003 with only very limited, if any, testing of the new HV bone cement.

24.    According to the *Journal of Arthroplasty*, "recent literature has shown that shown debonding of the tibial implant-cement interface as a potential cause for implant loosening.  The purpose of this case series was to report this phenomenon in a historically well-performing implant when used with high-viscosity cement (HVC) … Given our institution's experience and previously reported data demonstrating excellent survivorship with this total knee arthroplasty prosthesis, we propose that the early failures seen in this case series may be associated with the use of HVC cement."

25.    A primary reason the SmartSet HV Bone Cement fails is mechanical loosening.  The mechanical loosening is caused by a failure of the bond between the tibial baseplate at the implant-cement interface.  Mechanical loosening means that the attachment between the artificial knee and the existing bone has become loose.  Such loosening will eventually result in failure of the device and abnormal wear.  Mechanical loosening, as shown by recent studies, has occurred at a significantly increased rate in patients implanted with HV bone cement, including the SmartSet HV Bone Cement.

26.    A loose artificial knee generally causes pain, wearing away of the bone, instability, and other problems.  It can severely restrict a patient's daily activities as it can involve a severe physical and emotional burden for the patient.

27.     Once the pain becomes unbearable or the individual loses function of the knee, another operation, often called a "revision surgery," may be required to remove the knee implant and replace it with a new one.

28.     Unfortunately, a failed total knee prosthesis often causes severe bone loss. Therefore, revision surgeries on a failed total knee due to loosening often require reconstruction of the severe bone loss.

29.     The success rate of a revision surgery is much lower than that of the initial total knee replacement and the risks and complications are higher, including limitations in range of motion, the ability to walk, and even death.

30.     Defendants knew or should have known about the early failure rates and safety issues with its HV Bone Cements, including SmartSet HV Bone Cement.

31.     Despite Defendants' knowledge of early failures, Defendants continue to represent that its HV bone cements, including SmartSet HV Bone Cement, are safe and effective.

32.     For instance, Defendants have made the following representations to consumers and physicians regarding their HV bone cements:

(a) "Available in medium and high viscosity formulations, with and without Gentamicin, SMARTSET Bone Cements were developed to meet the needs of today's orthopaedic surgeons."

(b) "Fatigue life is influenced by a variety of factors, one of which is the method of sterilization.  SMARTSET MV Bone Cement and GMV Gentamicin Bone Cement and SMARTSET HV Bone Cement and HV Gentamicin Bone Cements are sterilized with ETO which preserves the molecular weight of the polymer chains.  This leads to improved fatigue strength over cements that are Gamma sterilized."

(c) "For high-viscosity needs, choose SmartSet HV Bone Cement."

33.    Although Defendants knew about the high number of SmartSet HV Bone Cement failures resulting in revision surgeries, Defendants failed to warn surgeons, consumers and patients, and allowed, marketed, and promoted the defective design to continue to be implanted by unsuspecting surgeons into unsuspecting patients, including Ms. Replogle and her physicians.

## FEDERAL REQUIREMENTS

34.    Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

35.    Pursuant to federal law, a device is deemed to be misbranded if, among other things, other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof.  *See* 21 U.S.C. § 352.

36.    Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices. In particular, manufacturers must keep records and make reports if any medical device may have caused or contributed to death or serious injury, or if the device has malfunctioned in a manner likely to cause or contribute to death or serious injury.  Federal law also mandates that the FDA establish regulations requiring a manufacturer of a medical device to report promptly to FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health. *See* 21 U.S.C. § 360i.

37.    Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation (including a process to assess the performance of a device but not including an evaluation of the safety or effectiveness of a device), packaging, storage, and installation of a device conform to current good manufacturing practice ("CGMP"), as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in compliance with federal law. *See* 21 U.S.C. § 360j(f).

38.    The federal regulations requiring conformance to good manufacturing practices are set forth in 21 CFR § 820 et seq.  As explained in the Federal Register, because the CGMP regulations must apply to a variety of medical devices, the regulations do not prescribe the details for how a manufacturer must produce a device.  Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured, and the manufacturing processes employed. Manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

39.    Pursuant to 21 CFR § 820.1(c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under section 501(h) of the Federal Food Drug & Cosmetic Act ("the Act") (21 U.S.C. § 351).

40.    The regulations under 21 CFR Part 820 include, but are not limited to, and require Defendants to:

(a) establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured. 21 CFR § 820.5;

(b) establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met. 21 CFR § 820.30(a);

(c) establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements. 21 CFR § 820.30(d);

(d) establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements. 21 CFR § 820.30(f);

(e) establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review and approval of design changes before their implementation. 21 CFR § 820.30(i); and

(f) develop, conduct, control, and monitor production process to ensure that a device conforms to its specifications. 21 CFR § 820.70(a).

41.    Upon information and belief, Defendants' SmartSet HV Bone Cement is adulterated pursuant to 21 U.S.C. § 351 because, among other things, Defendants failed to comply with the numerous regulations under 21 CFR § 820 regarding product design and manufacturing.

42.    Upon information and belief, Defendants' SmartSet HV Bone Cement is adulterated pursuant to 21 U.S.C. § 351 because, among other things, it failed to meet established performance standards, and/or the methods, facilities, or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

43.    As a result of Defendants' failure to establish and maintain CGMP, Defendants' SmartSet HV Bone Cement was defective and failed to properly adhere to the bone and/or prosthetic device, causing loosening of the device, and injury to Plaintiff.

44.    Upon information and belief, Defendants' SmartSet HV Bone Cement is misbranded because, among other things, it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

## CASE SPECIFIC FACTUAL ALLEGATIONS

45.    On September 8, 2015, Linda Replogle underwent left-sided total knee replacement surgery performed by Dr. William Athans at South Lake Hospital in Clermont, Florida.  Ms. Replogle was implanted with Zimmer and NexGen components.

46.    On September 8, 2015, Dr. Athans utilized the defective SmartSet HV Bone Cement (Ref # 3092040HV), which was designed, manufactured, marketed, distributed, labeled, marketed and sold by Defendants throughout the United States, including here in the State of Florida and in this District.  The SmartSet HV Bone Cement was purchased by Ms. Replogle and this action relates to the SmartSet HV Bone Cement.

47.    After the SmartSet HV Bone Cement was implanted, Ms. Replogle began experiencing, among other problems, severe and persistent pain, discomfort, instability and difficulty ambulating caused by aseptic loosening caused by the defective SmartSet HV Bone Cement.

48.    On August 12, 2019, Ms. Replogle underwent revision surgery due to, among other things, a failed left total knee with chronic instability, poly wear, and internal rotation of the femoral component.  The operative report notes the presence of either loose cement or poly wear with granular structured tissue in the suprapatellar pouch.  The poly component was removed and found to have significant wear and yellowing in a short term.

49.     Upon information and belief, the failure of Plaintiff's knee and loosening she experienced prior to explant was due to the defective SmartSet HV Bone Cement implanted in her left knee.

50.     Neither Ms. Replogle, nor her physicians were aware, by warning or otherwise, of the defects of the SmartSet HV Bone Cement, and would not have used the SmartSet HV Bone Cement in the original total knee replacement surgery had they been aware of the defective nature of the product.

51.     As a direct and proximate result of Defendants placing the defective SmartSet HV Bone Cement in the stream of commerce, Ms. Replogle has suffered and continues to suffer injuries and damages, including, but not limited to past, present and future physical and mental pain and suffering; and past, present and future medical, hospital, rehabilitative, monitoring, and pharmaceutical expenses, economic damages, severe and possibly permanent injuries, and other related damages.

52.     All of the injuries and complications suffered by Ms. Replogle were caused by the defective and negligent design, warnings, construction, and unreasonably dangerous character of the SmartSet HV Bone Cement.  Had Defendants not concealed the known defects, the early failure rate, the known complications, and the unreasonable risks associated with the use of the SmartSet HV Bone Cement, Ms. Replogle would not have consented to the SmartSet HV Bone Cement being used in her total knee arthroplasty.

## COUNT 1 – STRICT LIABILITY AGAINST THE DEFENDANTS

53.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 52 above as if set forth fully herein.

54.    At all times material, Defendants were in the business of and gained profits from designing, developing, testing, manufacturing, labelling, assembling, marketing, distributing, and/or selling medical devices and medical products - including the subject SmartSet HV Bone Cement used in Plaintiff's left knee implant surgery on September 8, 2015 - through the stream of commerce in Florida and other states.

55.    Defendants designed, developed, tested, assembled, manufactured, distributed, and/or sold SmartSet HV Bone Cement, which is also hereinafter referred to as the ("subject product").

56.    Defendants placed the SmartSet HV Bone Cement into the stream of commerce.

57.    Upon information and belief, the SmartSet HV Bone Cement was unreasonably dangerous and defectively manufactured and/or designed and sustained premature failure because:

a.    it was defectively designed, marketed, manufactured, distributed, instructed, and warned by Defendants;

b.    it was inappropriate for this application;

c.    it failed prematurely;

d.    it was defectively designed because, among other things, it failed to bond properly, and thereby resulted in loosening, instability, poly wear, and/or rotation;

e.    Defendants failed to instruct and/or warn of the serious risk of loosening and failure of the SmartSet HV Bone Cement resulting in injuries;

f.    Defendants failed to adequately instruct and/or warn healthcare providers, including those healthcare providers who utilized the SmartSet HV Bone Cement in Plaintiff, of the serious risk of loosening and failure of the SmartSet HV Bone Cement resulting in injuries;

g.    Defendants manufactured, produced, promoted, created, and/or designed the SmartSet HV Bone Cement without adequately testing it;

h.      Defendants failed to provide adequate warning of the dangers associated with the SmartSet HV Bone Cement;

i.      Defendants defectively designed, researched, developed, manufactured, marketed, promoted, and sold a medical device when it knew or reasonably should have known of the high risk of loosening and failure;

j.      Defendants continued production and sale of the SmartSet HV Bone Cement given the propensity of the medical device to loosen and fail at high rates resulting in subsequent surgery and injuries;

k.      Defendants provided inaccurate labeling and inadequate warnings and instructions with the SmartSet HV Bone Cement; and

l.      Other breaches and defects which may be shown through discovery or at trial;

58.     At all times relevant, Defendants had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the SmartSet HV Bone Cement into the stream of commerce, including a duty to assure that the SmartSet HV Bone Cement did not pose a significantly increased risk of bodily harm to its users as well as a duty to comply with federal requirements.  Defendants breached this duty.

59.     Defendants owed a duty to follow the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the SmartSet HV Bone Cement, and otherwise distributing the SmartSet HV Bone Cements.   Defendants breached this duty.

60.     Defendants owed a duty of care to provide adequate warnings and instructions to the physicians, providers, suppliers, patients, distributors, or other end users of the SmartSet HV Bone Cement.  Defendants breached this duty.

61.    Defendants performed inadequate evaluation and testing on the SmartSet HV Bone Cement where such evaluation and testing would have revealed the propensity of loosening and subsequent impact on knee implant components, and ultimately failure causing pain, swelling, instability and other complications and injuries that Plaintiff has experienced.

62.    Prior to and after the date of Plaintiff's initial knee replacement surgery in which the SmartSet HV Bone Cement was utilized and implanted, the Defendants were on notice that the SmartSet HV Bone Cement caused serious complications, including debonding and detachment.

63.    Defendants had a duty to perform post-marketing testing of the SmartSet HV Bone Cement; investigate the root cause of these complications; suspend sales and distribution; and warn physicians and patients of the propensity of SmartSet HV Bone Cement to debond, detach and fail. Defendants breached this duty.

64.    Plaintiff, as a purchaser of an SmartSet HV Bone Cement, is within the class of persons that the statutes, regulations and obligations previously described herein are designed to protect, and Plaintiff's injuries are the type of harm these statutes, regulations, and obligations are designed to prevent.

65.    Defendants knew or should have known that the Plaintiff could foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

66.    One or more of these unreasonably dangerous defects was/were present in the subject product when Plaintiff's physicians performed Plaintiff's implant in 2015, and also at the time Defendants placed the subject product into the stream of commerce.

67.    The subject product was defective because of a manufacturing defect because it was in a condition unreasonably dangerous to the Plaintiff and because the product was expected

to and did reach the user (Plaintiff herein) without substantial change affecting that defective condition.

68.     The subject product was unreasonably dangerous because of a manufacturing defect because it was different from its intended design and failed to perform as safely as the intended design would have performed.

69.     The subject product was defective because of a design defect because it was in a condition unreasonably dangerous to the Plaintiff and the product was expected to and did reach the Plaintiff without substantial change affecting that condition.

70.     The subject product was unreasonably dangerous because of its design because it failed to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer and/or the risk of danger in the design outweighed the benefits.

71.     As a direct and proximate result of the aforementioned defects, Plaintiff was severely and permanently injured and damaged.

72.     Among other damages and injuries, Plaintiff sustained severe, catastrophic, and permanent bodily injuries and/or the aggravation or activation of an existing disease or physical defect, and resulting pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life experienced in the past and to be experienced in the future; the reasonable value or expense of hospitalization and medical and nursing care and treatment necessarily or reasonably obtained by Plaintiff in the past and to be so obtained in the future; earnings and/or working time lost in the past and loss of ability to earn money and loss of net accumulations in the future; and out of pocket expenses.  These losses are either permanent or continuing in nature and Plaintiff has suffered these losses in the past and will

suffer these losses in the future.

WHEREFORE, the Plaintiff, Linda Replogle demands judgment for damages against the Defendants for compensatory damages, costs, interest as allowed under applicable law, and any and all other relief the Court deems just or appropriate or is necessary to effectuate any order or decree of the Court.  Plaintiff further reserves the right to request punitive damages, if appropriate, at a later time.

## COUNT 2 - NEGLIGENCE AGAINST DEFENDANTS

73.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 52 above as if set forth fully herein.

74.     At all times material, Defendants owed and/or undertook a duty to use reasonable care in the design, development, testing, manufacture, assembly, marketing, distribution, and sale of the subject product.

75.     Defendants breached its duty to use reasonable care in the design, development, testing, manufacture, assembly, marketing, distribution, and sale of the subject product in one or more of the following ways by, upon information and belief, negligently:

a.     Designing, marketing, manufacturing, distributing, instructing, and warning;

b.     Designing, marketing, manufacturing, and distributing the subject product, which was inappropriate for this application and failed prematurely;

c.     Designing, marketing, manufacturing, and distributing the subject product, which failed to bond to the bone and/or implanted components and thereby resulted in loosening, instability, poly wear, and rotation;

d.     Failed to instruct and/or warn of the serious risk of loosening and failure of the SmartSet HV Bone Cement resulting in injuries;

e.     Failed to adequately instruct and/or warn healthcare providers, including those healthcare providers who utilized the SmartSet HV Bone Cement in Plaintiff, of the serious risk of loosening and failure of the SmartSet HV Bone Cement resulting in injuries;

f.     Manufactured, produced, promoted, created, and/or designed the SmartSet HV Bone Cement without adequately testing it;

g.     Failed to provide adequate warning of the dangers associated with the SmartSet HV Bone Cement;

h.     Defectively designed, researched, developed, manufactured, marketed, promoted, and sold a medical device when it knew or reasonably should have known of the high risk of loosening and failure;

i.     Continued production and sale of the SmartSet HV Bone Cement given the propensity of the medical device to loosen and fail at high rates resulting in subsequent surgery and injuries;

j.     Provided inaccurate labeling and inadequate warnings and instructions with the SmartSet HV Bone Cement; and

k.     Other breaches and negligence, which may be shown through discovery or at trial;

76.    At all times relevant, Defendants had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the SmartSet HV Bone Cement into the stream of commerce, including a duty to assure that the SmartSet HV Bone Cement did not pose a significantly increased risk of bodily harm to its users as well as a duty to comply with federal requirements.  Defendants breached this duty.

77.    Defendants owed a duty to follow the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing

for use, warning of the risks and dangers of the SmartSet HV Bone Cement, and otherwise distributing the SmartSet HV Bone Cements. Defendants breached this duty.

78.     Defendants owed a duty of care to provide adequate warnings and instructions to the physicians, providers, suppliers, patients, distributors, or other end users of the SmartSet HV Bone Cement. Defendants breached this duty.

79.     Defendants performed inadequate evaluation and testing on the SmartSet HV Bone Cement where such evaluation and testing would have revealed the propensity of loosening and subsequent impact on knee implant components, and ultimately failure causing pain, swelling, instability and other complications and injuries that Plaintiff has experienced.

80.     Prior to and after the date of Plaintiff's initial knee replacement surgery in which the SmartSet HV Bone Cement was utilized and implanted, the Defendants were on notice that the SmartSet HV Bone Cement caused serious complications, including debonding and detachment.

81.     Defendants had a duty to perform post-marketing testing of the SmartSet HV Bone Cement; investigate the root cause of these complications; suspend sales and distribution; and warn physicians and patients of the propensity of SmartSet HV Bone Cement to debond, detach and fail. Defendants breached this duty.

82.     Plaintiff, as a purchaser of an SmartSet HV Bone Cement, is within the class of persons that the statutes, regulations and obligations previously described herein are designed to protect, and Plaintiff's injuries are the type of harm these statutes, regulations, and obligations are designed to prevent.

83.     Defendants knew or should have known that the Plaintiff could foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

84.    One or more of these unreasonably dangerous defects was/were present in the subject implants when Plaintiff's physicians implanted them in Plaintiff in 2015, and also at the time Defendants placed them into the stream of commerce.

85.    The subject product was defective because of a manufacturing defect because it was in a condition unreasonably dangerous to the Plaintiff and because the product was expected to and did reach the user (Plaintiff herein) without substantial change affecting that defective condition.

86.    The subject product was unreasonably dangerous because of a manufacturing defect because it was different from its intended design and failed to perform as safely as the intended design would have performed.

87.    The subject product was defective because of a design defect because it was in a condition unreasonably dangerous to the Plaintiff and the product was expected to and did reach the Plaintiff without substantial change affecting that condition.

88.    The subject product was unreasonably dangerous because of its design because it failed to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer and/or the risk of danger in the design outweighed the benefits.

89.    As a direct and proximate result of the aforementioned negligence, Plaintiff was severely and permanently injured and damaged.

90.    Among other damages and injuries, Plaintiff sustained severe, catastrophic, and permanent bodily injuries and/or the aggravation or activation of an existing disease or physical defect, and resulting pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life experienced in the past and

to be experienced in the future; the reasonable value or expense of hospitalization and medical and nursing care and treatment necessarily or reasonably obtained by Plaintiff in the past and to be so obtained in the future; earnings and/or working time lost in the past and loss of ability to earn money and loss of net accumulations in the future; and out of pocket expenses. These losses are either permanent or continuing in nature and Plaintiff has suffered these losses in the past and will suffer these losses in the future.

WHEREFORE, the Plaintiff demands judgment for damages against the Defendants for compensatory damages, costs, interest as allowed under applicable law, and any and all other relief the Court deems just or appropriate or is necessary to effectuate any order or decree of the Court. Plaintiff further reserves the right to request punitive damages, if appropriate, at a later time.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests and demands a jury trial.

Dated this 7th day of September 2019.

Respectfully submitted,

LAW OFFICES OF SEAN M. CLEARY, P.A.
19 West Flagler St., Suite 618
Miami, Florida 33130
Telephone:    (305) 416-9805
Facsimile:    (305) 416-9807
Email: sean@clearypa.com

By: ___/SMC/ Sean M. Cleary_____
     SEAN M. CLEARY
     Florida Bar No. 0146341